### No. 6439.

### SUCCESSION OF MARGARET McAULEY, WIFE OF JOHN A. O'BRIEN.

A transposition of the words of a will in order to make the devise conform to some supposed intent of the testator will not be allowed when the words, just as they stand, have a manifest meaning and express a clear and intelligible idea. Such transposition is only permissible when the language of a will is senseless or contradictory.

An administrator can not avail of any defect in a legal proceeding caused by his fault.

APPEAL from the Second District Court, parish of Orleans. *Tissot*, J. *James Timony, T. W. Collens, A. Robert*, and *W. B. Lancaster*, for appellants. *Hornor & Benedict, J. L. Tissot*, and *Hays & New*, for appellees.

The opinion of the court was delivered by MANNING, C. J.

On the twenty-third of November, 1874, Margaret McAuley, wife of John A. O'Brien, made her olographic will in form as follows:

NEW ORLEANS, November 23, 1874.

"I, Margaret O'Brien, of the city of New Orleans, and State of Louisiana, being of sound mind leave this my last will and testament.

"I name my husband executor of my last will. All my debts must be paid out of estate. Rent for store my husband must not be held responsible as he has signed notes for same for me. All bills for goods bought by me a note of Washington Smith of New York, for the sum of four hundred dollars said is mine but is signed by my husband John A. O'Brien. All my funeral expenses, I desire to be buried as plain as possible a plain stone to mark my last resting place. The sum of three thousand dollars to be paid to my husband with 8 per cent interest, from 16 August 1872. All my furniture is his. All my jewelry that is a diamond set breast-pin earrings and bracelets a diamond ring, my wedding ring I de-

sire to be buried with.   My  diamond  watch  and  chain  J  leave  to  my
sister Frances Dowling.

"After all my funeral expenses  are  paid  Dr.  bill  and  all  sundries  ex-
penses are paid if  there is any money left I wish it settled  on  my sister
Frances Dowling children for their use and benefit.   If I should leave a
child all this will to be null as  all  I  have  belongs  by right to my child,
either male or female.   I want my child put under the care of Sister
Chantreral as I know she will take good care of it my husband to pay
her out of the revenues of my estate.

"MARGARET O'BRIEN."

The writing covers the first and  part of  the second page of  the paper.
The signature made at that time  is  at  the  bottom  of the second page,
leaving a space of several lines between it and the concluding words of
the will.   In January, 1875, the testatrix was delivered of a child, which
survived its birth but a short time.   On the nineteenth of August, 1875,
after the death of her child, the testatrix affixed her signature to the
writing of the previous November immediately under the last line and
added the following words between that signature and the first signature,
at or near the bottom of the page:

"NEW ORLEANS, August 19, 1875.

"If  I  and my husband should die during my trip from home, after all
my debts are paid whatever I die possessed I leave to St. Mary's Orphan
Boys' Asylum less six hundred dollars          MARGARET O'BRIEN.
for my mother.                                   MARGARET O'BRIEN.

"ADELINE SHELSTONE."

On the day following that on which this was written Mrs. O'Brien left
New Orleans with her husband on a journey of business or pleasure
for New York, and she died there on the twelfth of September.   Her
husband returned immediately, and on the eighteenth of that month
presented the will or wills of his deceased wife for probate and qualified
as executor.

On the fourth of October of the same year, the mother and sisters of
the deceased, who are her heirs-at-law, instituted an action to annul
the probate and set aside the wills upon the grounds  that the first writ-
ing, which they call the first will, was revoked by the birth of a child
posterior to its date, and the second falls because the event upon the
happening of which the institution of the universal legatee was made
to depend has not happened and can not now happen; i. e., the death of
both husband and wife during their trip north.

The executor answers by a general denial.   The St. Mary's Orphan
Boys' Asylum pleads the general issue and specially avers that the two
instruments constitute but one will, and that both comply with the re-
quisites of an olographic will, and that the dispositions made are " in

conformity to law and can be easily executed, being intelligible and comprehensible in its extent and designs," and last, that the document was signed and dated by the deceased subsequent to the birth and death of her child.

Much stress has been laid in the arguments, both oral and written, on the fact that the two writings are of different dates, were written with two shades of ink, the signature first spoken of being of the same shade as the body of the writing of November, 1874, and the others of the same shade as the body of what is termed by some the second will and by others the codicil. The different shades of ink are worthy of observation only because they assist us in ascertaining the circumstances under which the two writings were made. We find no difficulty in the different dates. Villeneuve says:

"Un testament fait en un seul context mais signé et daté plusieurs fois de dates différentes ne constitue pas autant de testaments qu' il y a de parties séparément dateés et signées. En conséquence, l'acte portant révocation et tous testaments antérieurs, sauf un seul indiqué comme ayant la dernière date du testament divisée en plusieurs parties ne porte aucune atteinte aux parties de ce testament qui ont une date différente." Digest 1850, tome 4, 139, No. 210. And further on : "jugé, de meme, que bien que la date primitive d'un testament olographe en rapporte la confection antérieure à la date de l'acte révocatoire, le testateur a pu cependant donner à son testament par une surcharge approuvée une nouvelle date postérieure a celle de l'acte révocatoire, et soustraire ainsi son testament aux effets de la révocation." *Idem*, p. 4, No. 240. See Journal du Palais, 1847, 1, 49, 51.

More pertinent than these teachings of Villeneuve is the observation of Dallas : " Un testament olographe portant deux dates différentes, l'une au commencement et l'autre à la fin, ne peut être annullé sous prétexte qu'il y a incertitude de la date. On doit supposer que le testateur a pris plusieurs jours à faire son testament." Vol. v. 632.

We consider the writings before us as one will. The testatrix knew at the time of the first signature that she bore in her bosom a child whose birth would annul her testament. The child was born less than two months from the date of the instrument, and she writes "if I should leave a child, all this will to be null." After the death of the child, and when about to make her will in view of a projected trip north, she mentally reverts to her former disposition of her property, draws the paper containing it from its place of deposit, and signs it anew immediately after its concluding words. Manifestly this was intended by her as a republication of that writing as a part of her will. The death of the child had destroyed the vitality of the will as then written. The republication revivified it. The testatrix then added another clause

providing a disposition of her property upon a contingency expressed therein, and signed the whole instrument, and dated it, and this last date is the date of the will.

We have now to consider the effect of this last clause.

The counsel for the defendants, in a brief which has been very service- able to us, have argued with equal ingenuity and subtlety that the language used by the testatrix does not express her meaning. Undoubt- edly a fundamental rule in the interpretation of wills is that the inten- tion of the testator must be ascertained, and when ascertained, effect given to it; and in order to ascertain the intention courts look outside and behind the *ipsissima verba* of the instrument, and resort to the evidence of circumstances when the literal meaning leads to absurd or impossible consequences. This is when the words are ambiguous or contradictory, or the meaning latent. Pothier in his fourth rule for the interpretation of testaments teaches that the law prefers the sense which saves from intestacy, and that reference may be had to surrounding cir- cumstances to ascertain the sense; and in his eighteenth rule, that "a will should be interpreted by means of surrounding circumstances." Traité des Testaments, chap. vii. These rules are embodied in our Civil Code in articles 1705, 1706, 1708, new numbers 1712, 1713, 1715.

The circumstances surrounding the confection of these two writings are developed in the evidence, and have already been adverted to. In November, 1874, she made her will, giving specific instructions concern- ing certain debts, and explaining other matters which might not have been understood without that explanation, and appointing her husband executor. She either intended to add something later, or she thought, as many illiterate persons do, that she must sign at the bottom of the page, and accordingly her signature in the same shade of ink is found there. That will was intended to provide a disposition of her property in case her death should precede the birth of her child. In August, 1875, when she knew that the will already written was null, since the event which caused its invalidation had occurred meanwhile, and being about to commence a journey—troubled, too, by a presentiment that she would never return—and perceiving that the paper contained what she wished, so far as it went, but apprehensive that the addition of another clause with a new date might not sufficiently evince her desire to continue the dispositions contained in it in force, she signs it again, and writes the clause relative to the asylum.

We are not embarrassed, as are the counsel for the asylum, by the seeming inconsistency of naming her husband executor in the first part of her will and providing for the contingency of his death in the conclud- ing part. The thought present to her mind evidently was to provide for the two contingencies of her own death, her husband surviving, and the

death of both of them. In the writing of November, 1874, she also con-templates the survival of her child, and directs that it be placed under the care of a particular person, and in that of August, 1875, when her child was dead, she provides what shall be done if her husband and her-self shall both die during their trip.

The counsel for the asylum, pursuant to their theory that the intention of the testatrix has not been accurately expressed, propose a new read-ing of the last clause of the will, effected by a transposition of words, thus:

| THE TEXT. | THE INTENTION. |
| --- | --- |
| If *I and my husband* should die during *my* trip from home after all my debts are paid whatever I die possessed I leave to St. Mary's Orphan Boys' Asylum less six hundred dollars for my mother. | If I should die during my *and my husband's* trip from home after all my debts are paid whatever I die possessed I leave to St. Mary's Orphan Boys' Asylum, less six hundred dollars for my mother. |

A transposition of words is sometimes permitted. Jasman says: "It is quite clear that where a clause or expression, otherwise useless and contradictory, can be rendered consistent with the context by being transposed, the courts are warranted in making that transposition." Treatise on Wills, 1 vol., 437. The nineteenth of his general rules of con-struction reads: "That words and limitations may be transposed, sup-plied, or rejected, where warranted by the immediate context or the general scheme of the will, but not merely on a conjectural hypothesis of the testator's intention, however reasonable, in opposition to the plain and obvious sense of the language of the instrument." *Idem*, 2 vol., 744. And Lord Ellenborough, "in a case where," as he said, "the testator had thrown together a heap of words, the sense and meaning of which he did not clearly apprehend," ruled that when "the words taken in the order in which they stood did not convey *any* meaning, the estab-lished rules of construction clearly authorized the transposition." Wolfe vs. Allcock, 1 B. and Ald. 137.

The transposition is then permissible when the words used by a tes-tator do not convey any meaning, or where the expression is senseless or contradictory, or when such transposition is warranted by the context and like cases; but a conjectural hypothesis is not permitted in opposi-tion to the plain and obvious sense of the language. This court enunci-ated the same doctrine in Theall's case, where it was said: "In the con-struction and interpretation of wills the intention of the testator must be sought in the words he has used in the will, and not *aliunde*. Con-structions and interpretations of wills are not to be resorted to for the discovery of the testator's intention when he has used none but plain, unequivocal expressions." 7 La. 226.

Succession of Margaret McAuley.

The words used by the testatrix in the will now before us are intelligible in the order in which they stand: "If I and my husband should die during my trip from home." The objection to the new collocation proposed by the counsel for the asylum is that it is not our province to make a will for the deceased, but to interpret and give effect to the one she made. If she chose to make her institution of the asylum as her universal legatee contingent upon the death of her husband and herself, it is not for us to say that she meant otherwise, or that it would have been more reasonable and proper to have made that contingency her own death only.

Lord Coke said that "wills and the construction of them do more perplex a man than any other learning." This perplexity may often be diminished by avoiding a strained construction of words which have an obvious import. Guided by that rule in this case, we are of opinion that the legacy to the asylum or its institution as universal legatee lapses by the non-happening of the event on which it was made to depend.

One other question remains. A sale of perishable property, the goods in the millinery store of deceased, and of the unexpired lease of the store, was made under order of the court. The asylum seeks to, annul that sale, but as we have decided that it is without interest in the succession, its prayer to annul can not be heard. The executor and husband was the purchaser of most of the stock and of the lease, which latter brought at public auction a bonus of $3525. The succession, of which he is the executor, is benefited by the sale. As purchaser, he has not made a good bargain, and wishes to be delivered from fulfilling it. If there are defects in the judicial proceedings which terminated in the sales, it was the fault of the executor or his agents. He can not take advantage of his own wrong.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be and it is hereby affirmed with costs.